IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2017 NOV 16  PM 2: 30**

JOHN DOE,

        Plaintiff,

v.

THE UNIVERSITY OF VERMONT AND STATE
AGRICULTURAL COLLEGE, THE BOARD OF
TRUSTEES OF THE UNIVERSITY OF
VERMONT AND STATE AGRICULTURAL COLLEGE
TRUSTEES, E. THOMAS SULLIVAN, individually
and as agent for the University of Vermont and
State Agricultural College, NICK STANTON,
individually and as agent for The University of Vermont
and State Agricultural College, LAURA B. LEE,
individually and as agent for The University Of
Vermont and State Agricultural College,
THOMAS MERCURIO, individually and as agent for The
University of Vermont and State Agricultural College
BRANDIN HOWARD, individually and as agent for
The University of Vermont and State Agricultural College
and MARY MCCLEMENTS, individually and as agent for
The University of Vermont and State Agricultural College,

        Defendants.

Civil Action No. 2: 17-CV-230

BY _____

DEPUTY CLERK

## COMPLAINT

John Doe (a pseudonym),[1] by his attorneys Cole Associates Civil Law, PLLC and

Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendants, respectfully alleges

as follows:

### THE NATURE OF THIS ACTION

This action arises out of the actions taken and policies and procedures employed by Defendants

The University of Vermont and State Agricultural College ("UVM" or the "University"), the

Board of Trustees of The University of Vermont and State Agricultural College ("Board of

Trustees"), E. Thomas Sullivan ("Sullivan"), Nick Stanton ("Stanton"), Laura B. Lee ("Lee"),

Thomas Mercurio ("Mercurio"), Brandin Howard ("Howard"), and Mary McClements

("McClements") (collectively, "Defendants") in investigating and adjudicating

---

[1]  Plaintiff herewith files a motion to proceed by pseudonym.

false allegations made against Plaintiff, a male sophomore student at UVM, concerning nonconsensual sexual contact with fellow UVM student Jane Doe.

2.      United States Secretary of Education Betsy DeVos has recently spoken out about the "failed system" of campus sexual assault enforcement, noting that "one person denied due process is one too many." UVM's policy and procedures are an exemplar of this failed system.

3.      Jane Doe's false accusations against John Doe were accepted as fact and upheld by Defendants using a *Kafkaesque* process that denied John Doe due process of law in violation of constitutional due process and 42 U.S.C. § 1983: there was no hearing of any kind; there was no cross-examination; there was no sworn testimony; a sanction "hearing" was held after a single investigator had already determined responsibility; John Doe could not adequately defend himself; there was no presumption of innocence but rather a presumption that the complainant's accusations were true; there was no reasoned consideration of evidence as required by the applicable burden of proof; and UVM's policies permitted unfettered discretion to engage in discriminatory decision-making.

4.      An erroneous outcome and an unduly severe and disproportionate sanction resulting from anti-male discriminatory bias afflicting UVM's sexual misconduct policy and procedures also occurred in violation of Title IX of the Education Amendments of 1972.

5.      Defendants were grossly negligent in implementing and executing UVM's Policy and Procedures in the case against John Doe and they acted in flagrant disregard of his rights.

6.      UVM also breached express and implied agreements with John Doe and acted in bad faith in failing to fulfill its promises to him as a student enrolled, and paying tuition, at UVM.

7.      Overall, John Doe was subjected to a biased and flawed process through which he was found responsible for conduct that he did not commit due to, among other things,

Defendants' use of a single investigator model, a bias against males accused of misconduct, ignorance of the requisite evidentiary standards, use of a poorly trained Sanctioning Panel which violated its own procedures, and demonstrated hostility toward John Doe as a male accused. UVM's failings are only exacerbated by its relationship with the U.S. Department of Education's Office for Civil Rights ("OCR") which is currently investigating the University. Indeed, UVM recently affirmed its commitment to victims of sexual misconduct. In the face of Jane Doe's criticism that UVM was not doing enough for female students, the University's administrators chose to make an example of John Doe, even though there was no evidence to support, or corroborate, Jane Doe's false allegations against him.

## THE PARTIES

8.     John Doe is a natural person residing in Connecticut.

9.     UVM is a public institution of higher education organized under the laws of the State of Vermont and located in Burlington, Vermont. UVM is the only land grant university in the State of Vermont and is the recipient of state and federal funding, contracts and grants.  It is subject to audit by the State of Vermont.

10.     UVM's Board of Trustees is comprised of 25 members who, as a Board, are entirely responsible for managing and controlling UVM's property and affairs, including setting and approving UVM's policies.

11.     Sullivan is the President of UVM. Sullivan is a resident of Vermont.

12.     Stanton is UVM's Title IX Coordinator. Stanton is a resident of Vermont.

13.     Lee is an Assistant Director in UVM's Office for Student Conduct. Lee is a resident of Vermont.

14.     Mercurio served as the Conduct Appeals Officer at all times relevant herein. Mercurio is a resident of Vermont.

15.     Howard is the Assistant Director for Athletic Campus in the Department of Residential Life at UVM. Howard served as a member of the Sanctioning Panel that decided to issue a one-semester suspension to John Doe. Howard is a resident of Vermont.

16.     McClements is UVM's Student Employment Coordinator. McClements served as a member of the Sanctioning Panel that decided to issue a one-semester suspension to John Doe. McClements is a resident of Vermont.

## JURISDICTION AND VENUE

17.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and Defendants.

18.     This Court has personal jurisdiction over Defendants on the ground that Defendants are conducting business at Defendant UVM within the State of Vermont.
Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.   **Background: The "April 2011 Dear Colleague Letter"**
     **Of The Department of Education's Office for Civil Rights.**

20.     On April 4, 2011, the OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The April 2011 Dear Colleague Letter provides a necessary set of background facts to this action.

21.     The April 2011 Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the April 2011 Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including sexual assault. Several colleges had previously been using a "clear and convincing," standard of proof and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

22.     The April 2011 Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The April 2011 Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools focus more on victim advocacy. It states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, many schools, including UVM, changed their sexual assault and sexual harassment policies and procedures.

23.     The Obama Administration, through the Department of Education ("DOE") and the OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of

5

sexual assaults on campuses. Catherine Lhamon ("Lhamon"), former Assistant Secretary of the DOE in charge of its OCR delivered the following message to colleges and universities:

(a)   In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)   In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Lhamon additionally stood behind the April 2011 Dear Colleague Letter.

(c)   In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on

to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d) Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

24. To support enforcement of the April 2011 Dear Colleague Letter, the OCR hired hundreds of additional investigators. As of October 10, 2017, the Federal Government had 353 open investigations at institutions of higher education, including UVM. This is the second round for UVM as, in August 2013, it negotiated a settlement with the OCR concerning its sexual harassment policy.

25. The colleges and universities under OCR investigation, including UVM, are fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In April 2014, the White House issued a report entitled "Not Alone", which included a warning that if the OCR finds that a Title IX violation occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, former

Vice President Joe Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

26.     To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

27.     The DOE and OCR have created significant pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt and impose harsher sanctions.

28.     The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

"Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

29.     Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

30.     In response to pressure from OCR, DOJ, and the Obama Administration, educational institutions like UVM have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

31.     On July 19, 2017, twenty State Attorneys General published a letter to the United States Secretary of Education, Betsy DeVos ("DeVos"), urging the Secretary to maintain the sexual assault reporting guidelines for college campuses currently found in Title IX. Among those signing the letter was T.J. Donovan, Vermont Attorney General. The letter was written "to express our serious concern over reports that your office is preparing to roll back important protections for survivors of sexual assault on college campuses" and that the OCR "must focus on the ultimate goal of ensuring that all students are protected from discrimination, including sexual harassment, assault, stalking and domestic violence, under Title IX."

32.     On September 7, 2017 DeVos vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both accusers and the accused. DeVos stated that "one person denied due process is one too many."

33.     The failure of educational institutions to provide fair and impartial policies and procedures led DeVos to declare that "the current approach isn't working. Washington has burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate. Where does that leave institutions, which are forced to be

judge and jury?" Moreover, DeVos stated, "It's no wonder so many call these proceedings 'kangaroo courts'. Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

34.     Regarding pressure from the OCR on institutions to adhere to "the failed system imposed policy by political letter," DeVos stated, "No school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington."

35.     Significantly, DeVos proclaimed that the "era of 'rule by the letter' is over." The "April 2011 Dear Colleague Letter" has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined." Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated.

36.     On September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

37.     The OCR noted that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*.'" *Id.* (citation omitted) (emphasis added). *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

38.     On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "September 2017 Guidance"). *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.   The   September   2017

Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

39.    The Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX…be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation; and (v) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation. *See id.*

40.    UVM's procedures for adjudicating sexual misconduct complaints is precisely the type of system referenced in DeVos' statement and in the September 22, 2017 Dear Colleague Letter. UVM's Title IX Coordinator, who clearly has a conflict of interest, acts as investigator, judge and jury in determining whether an accused is responsible for policy violations. UVM students accused of sexual misconduct, who are habitually male, are then subjected to a sanctioning panel which has no ability to question the Title IX Coordinator's judgment or finding of responsibility. Upon information and belief, the sanctions issued by the panel in sexual misconduct cases, including John Doe's, have been disproportionate to the violations at issue and the panel has failed to consider the impact of separating respondents from their education when issuing sanctions. UVM students accused of sexual misconduct, like John Doe, have no meaningful opportunity to be heard and no meaningful right to an appeal. Moreover, they are presumed guilty from the start.

11

## II.   **The Incident Alleged To Have Occurred On April 28, 2017**

41.    On April 28, 2017, UVM student Jane Doe, a freshman, attended an off-campus party hosted by UVM's Rugby Club. She attended the party with a date, MP, and her friend, MC. According to Jane Doe's account to UVM's investigator she was at the party for approximately fifteen minutes.

42.    John Doe, a member of the Rugby Club and a sophomore at UVM, also attended the party with a date, GB.

43.    Approximately 80-100 people attended the party, and most of the men were dressed in shorts and blue blazers. The males in attendance included members of the Rugby Club, non-members and alumni.

44.    While dancing at the party with MP and MC, Jane Doe began dancing with a male whom she alleged grabbed her buttocks under her dress for approximately 20 seconds. After this contact, Jane Doe moved away from him but did not tell him to stop. Shortly thereafter, the male's friends started a conversation with him and, according to Jane Doe, she and the male stopped dancing.

45.    Jane Doe had not previously met the individual that she allegedly danced with at the party, nor had she ever met John Doe.

46.    John Doe attended the party with his date, GB. He denied ever meeting, or dancing with, Jane Doe, at the party or at any other time.

47.    When Jane Doe reported the alleged incident to UVM's Title IX Coordinator, Defendant Stanton, she did not identify the male she danced with as John Doe. Instead, she identified the individual by nickname. Upon information and belief, Stanton assumed that the male accused was a current student and member of the Rugby Club, which led him to wrongly conclude that the male accused was John Doe.

12

48.     Upon information and belief, based on this incorrect assumption, Stanton searched for, and found, a picture of John Doe on Facebook, showed that picture to Jane Doe and asked her if the person in the photo was the alleged perpetrator. Only then did Jane Doe "confirm" John Doe as the alleged perpetrator.

49.     Stanton failed to question Jane Doe about other men at the party with the same nickname as John Doe, ignored that both students and alumni attended the party (thus the alleged perpetrator was not necessarily a member of the Rugby Club or a current student), and failed to consider that all men in attendance at the party were dressed in nearly identical attire. When trying to confirm the identity of the alleged perpetrator, Stanton did not show Jane Doe any other photos.

**III.     UVM's Flawed Policy and Procedures**

50.     In accordance with UVM's Sexual Harassment and Misconduct Policy V.7.11.2 (effective date August 26, 2016) (the "Policy"), and corresponding Procedural Guidelines (the "Procedures"), UVM is required to conduct a "timely, fair, impartial and equitable investigation and disciplinary process with thoroughness and respect for all involved parties." The Policy also promises to provide the parties with "appropriate procedural rights in accordance with the law." UVM failed to provide John Doe with any protections, by Policy or otherwise, when investigating Jane Doe's unfounded allegations against John Doe. UVM's single investigator model, in which its Title IX Coordinator is solely responsible for investigating and adjudicating sexual misconduct cases, tramples on the rights of the accused, including in the case of John Doe, and offers none of the protections promised in the Policy and Procedures.

## A. The Biased Investigation Against John Doe

51.     Stanton, who serves as both Title IX Coordinator and Director of the Office of Affirmative Action and Equal Opportunity ("AAEO"), appointed himself as the sole investigator of Jane Doe's allegations. As a result of this self-appointment, Stanton was singlehandedly responsible for:

        (a)     Notifying John Doe of the allegations;

        (b)     Determining the potential policy violations raised by the alleged misconduct;

        (c)     Issuing a no contact order to both parties;

        (d)     Gathering any relevant evidence;

        (e)     Deciding, in his sole discretion, which witnesses should be interviewed and which evidence should be considered;

        (f)     Applying the preponderance of the evidence standard to the evidence he deemed relevant;

        (g)     Determining whether John Doe was responsible; and

        (h)     Issuing a written investigation report that was turned over to a Sanctioning Panel. The Sanctioning Panel was thereafter required to impose a punishment, and could neither reassess any aspect of the investigation, nor decline to impose a sanction.

52.     At the time that Stanton chose to singlehandedly conduct the investigation, he had been UVM's Title IX Coordinator for about two months. Upon information and belief, Stanton did not have the requisite training or experience to investigate sexual misconduct allegations. Upon information and belief, any training that Stanton did receive was biased against males.

14

53.     Stanton's self-appointment was a clear conflict of interest given his dual role as Title IX Coordinator and sole adjudicator of whether John Doe was responsible for violating UVM's Policy.

54.     Stanton met with Jane Doe on May 11, 2017, when she reported the events that allegedly occurred on April 28, 2017. At the meeting, Jane Doe could only identify the male who allegedly grabbed her buttocks by a nickname and stated only a belief that he was affiliated with the Rugby Club that hosted the party. Stanton effectively served as Jane Doe's advocate when he then searched Facebook for John Doe's profile and used his photo to suggest to Jane Doe that John Doe was the male she had interacted with at the party. Stanton showed no other photos to Jane Doe. In response, she predictably confirmed that he was the student who had allegedly grabbed her buttocks. Stanton failed to question Jane Doe about other men at the party with the same name or nickname as John Doe, ignored that both students and alumni attended the party and failed to consider that all men in attendance at the party were dressed in nearly identical attire.

55.     On May 15, 2017, Stanton emailed John Doe a letter notifying him of Jane Doe's allegations. The letter vaguely stated that "this conduct may constitute sexual exploitation and/or sexual harassment under the…Policy." John Doe did not receive precise notice of how the allegations fit within these Policy definitions until after Stanton had concluded the investigation and found him responsible.

56.     On May 18, 2017 Stanton interviewed John Doe by phone because UVM's spring semester had already concluded. John Doe denied having ever met or danced with Jane Doe, and noted that he could not imagine any situation where he would touch a woman without her consent. Despite John Doe's statement that he did not know Jane Doe, Stanton never provided John Doe with a photo of the complainant.

57.    On May 30, 2017, Stanton interviewed Jane Doe's friend MC, who attended the party with Jane Doe, by phone. MC made no mention of Jane Doe being touched by John Doe or seeing him grab her buttocks. In fact, all that MC reported was that Jane Doe was dancing with someone "creepy" which was not at all probative of the facts. MC also told Stanton that she did not know who Jane Doe was dancing with and that Jane Doe was uncomfortable "with some verbal comments made at the party."

On the call, Stanton asked MC to view John Doe's Facebook profile in order to "confirm" that he was the individual dancing with Jane Doe at the party. Stanton did not offer any other photos for MC's review. MC was never interviewed in person which made Stanton's request that MC conduct a Facebook search for John Doe even more unreliable and prejudicial. Moreover, Stanton never asked MC if she actually saw John Doe, or any male, dancing with Jane Doe, or if Jane Doe simply told her about it after the fact. Stanton sought to elicit testimony favorable to Jane Doe when he asked MC leading questions, rather than asking in an open ended manner what she personally observed during the party.

58.    On June 1, 2017, Stanton interviewed Jane Doe's friend, JI, whom Jane Doe spoke with after she came home from the party. All that JI could say was that Jane Doe told her "a lot of inappropriate things happened and she was upset." Jane Doe did not mention John Doe or that anyone, including John Doe, touched her inappropriately. JI was also interviewed by phone and Stanton never met with her in person.

59.    On June 5, 2017, Stanton interviewed AT, Jane Doe's friend, by phone. AT did not attend the party with Jane Doe. Rather she relayed to Stanton the substance of a conversation that she purportedly had with Jane Doe after she came home from the party. According to AT, Jane Doe did not expressly state that John Doe grabbed her buttocks, AT merely "had the impression" that this occurred based on her conversation with Jane Doe. AT also mentioned that

Jane Doe told her that she knew John Doe's first name because of the manner in which he responded to a questionnaire at the party, in which he purportedly wanted to switch dates so he could spend time with Jane Doe. This hearsay evidence was contradicted by John Doe's date, GB.

60.     On May 24 and June 5, 2017, Stanton interviewed John Doe's date, GB, by phone. GB consistently stated that John Doe was with her at the party for nearly the entire evening and that she had not witnessed him dancing with Jane Doe or anyone else. When asked about the questionnaire, GB told Stanton that she did not believe that John Doe even answered a question about switching dates because his answers were read aloud at the party and that did not come up. This supported John Doe's account to Stanton that he did not answer that question. Despite conflicting accounts about the questionnaire, Stanton made no efforts to investigate further, whether by obtaining copies from the Rugby Club or questioning the people responsible for reading the questions aloud at the party.

61.     On June 7, 2017, Stanton interviewed Jane Doe's date, MP, by phone. MP did not see John Doe and Jane Doe together on the evening in question.

62.     After Stanton concluded his witness interviews, he issued a "record of investigation" on June 5, 2017 that was reviewed by the parties. After briefly following up with Jane Doe's and John Doe's dates, Stanton issued a Report of Investigation on June 15, 2017 which included his findings that John Doe violated the Sexual Exploitation provision of UVM's Policy.

63.     John Doe was not given a meaningful opportunity to be heard prior to the issuance of the finding as no hearing was provided at all, much less one where witnesses, including Jane Doe, could be questioned or cross-examined or where Stanton's conclusions about the evidence could be weighed or tested. John Doe's entire academic career and future

were left in the hands of a single individual, a Title IX Coordinator whose primary interest was protecting UVM against potential Title IX violations and enforcing the edicts of the April 2011 Dear Colleague Letter.

64.     Based on the scarce evidence Stanton collected, by asking a few leading questions to witnesses over the phone, he found John Doe responsible for violating UVM's Policy. More specifically, Stanton found John Doe responsible for violating the Sexual Exploitation provision of UVM's Policy "by grabbing Complainant's buttock under her dress on April 28, 2017, when a reasonable person in Respondent's place would know that Complainant did not consent to the contact." As a result of this finding, John Doe ultimately received a one-semester suspension from UVM which is presently in effect.

65.     The evidence that Stanton managed to elicit from witnesses during his abbreviated and careless investigation does not support this finding and demonstrates that Stanton took Jane Doe's account as truth with complete disregard for the lack of evidence available to support her allegations against John Doe. This was despite the fact that, by Stanton's own account, John Doe "presented a generally credible account." Stanton mistakenly found that "corroborating" evidence enhanced Jane Doe's credibility, which led to his conclusion that John Doe was responsible for violating UVM's Policy.

66.     Stanton's finding of responsibility against John Doe evidences a misapplication of the preponderance of the evidence standard. Per UVM's Procedures:

> The purpose of an investigation conducted pursuant to these procedures is to determine whether University policy has been violated as alleged. That determination is made based on a preponderance of the evidence standard which requires that *the evidence supporting each finding be more convincing* than the evidence in opposition to it; that is, it is more likely than not that the alleged conduct occurred (emphasis added).

67.     Stanton's investigation report in John Doe's case did not refer to the above stated Policy definition but, instead, cited Second Circuit case law. Per UVM's Procedures "[a]n

individual's rights cannot be identical to the rights afforded an accused in a civil or criminal legal proceeding." Yet, Stanton acted as an attorney advocate for the University by applying civil legal standards, rather than conducting an impartial investigation according to the University's procedures.

68.     While Stanton acted not only as UVM's Title IX Coordinator, but as prosecutor, judge and jury—who applied legal standards outside the scope of the Policy and Procedures— John Doe navigated the investigation process without counsel. During their phone call in May 2017, John Doe asked Stanton whether he needed an attorney and Stanton offered no response. Rather, Stanton minimized the serious of the allegations, telling John Doe telling that he was 99% sure John Doe could not be expelled for the alleged misconduct if he were found responsible.

69.     Aside from Stanton's improper reliance on civil legal standards, Stanton's findings in John Doe's case do not meet the preponderance of the evidence standard set forth in UVM's Policy and Procedures. The basis for Stanton's determination that it was more likely than not that John Doe violated the Sexual Exploitation provision of UVM's Policy was that he found Jane Doe—the only individual he met with in person—to be more credible. His credibility determination was based in part, on finding that the evidence gathered "corroborated" Jane Doe's account, when in fact, the lack of evidence in support of Jane Doe's allegations could not have reasonably led to a finding of responsibility.

70.     Specifically, the "evidence" gathered by Stanton did not corroborate Jane Doe's account: (i) neither complainant nor MC could identify John Doe until Stanton provided them with his picture (and failed to provide pictures of anyone else at the party); (ii) MC, who was at the party with Jane Doe, stated only that Jane Doe complained to her about inappropriate verbal comments—she mentioned no physical contact; (iii) MC provided no reliable or credible

evidence that it was John Doe that danced with Jane Doe at the party; (iv) neither of the two friends Jane Doe spoke with after the party could definitively say that she told them that John Doe grabbed her buttocks; and (v) neither Jane Doe's nor John Doe's dates saw the two dancing together at the party. The lack of evidence against John Doe demonstrates the impact of Stanton's use of a single photo—John Doe's—to "identify" the alleged perpetrator. For obvious reasons, investigators of crimes do not show eyewitnesses a single photo for purposes of identification.

71.     The key finding in Stanton's report—that MC observed Jane Doe dancing with John Doe at the party—was erroneous. MC told the investigator that she did not know the man dancing with Jane Doe. MC only "identified" John Doe after Stanton showed her a picture from Facebook. Stanton showed MC no other photos, and failed to confirm whether she actually observed Jane Doe dancing with a male student, or whether she only learned about this from Jane Doe at some later time.

72.     There was simply not enough evidence in the record to prove a violation of UVM's Policy, under the preponderance of the evidence standard, against the alleged perpetrator John Doe.

73.     Stanton also incorrectly concluded that a reasonable person would have known that Jane Doe did not consent to the alleged contact. Per Jane Doe's account, the incident in question happened while dancing at a crowded party and for about twenty seconds after the individual she was dancing with had his hand on her lower back, which she permitted. When he next touched her buttocks she did not tell him to stop. Shortly after that, the individual became distracted by his friends and stopped dancing with Jane Doe. Under the circumstances, as explained by Jane Doe, it is not clear that a reasonable person would have known that Jane Doe did not consent to the brief touching of her buttocks.

20

74.     Per UVM's definition of consent: "[n]either verbal nor physical resistance is required to establish the absence of consent, but lack of physical or verbal resistance may be considered in the context of all the circumstances, in determining whether the Respondent knew or reasonably should have known that the Complainant did not consent." Here, Stanton failed to take into account the context of all the circumstances, which clearly demonstrated that the person dancing with Jane Doe—in a crowded room for a matter of minutes—would *not* have known that she did not consent to the alleged contact. That Jane Doe may have felt internally uncomfortable would not have been apparent to the person she was dancing with.

75.     Stanton's investigation report also contained biased and prejudicial information, including hearsay, none of which was relevant to the allegations including: (i) that Jane Doe was dancing with a "creepy" guy at the party who was mean to his date; (ii) that "everyone was pretty creepy" at the party; (iii) JI's conclusion that "[s]omething definitely happened" even though JI was not at the party; and (iv) AT's "impressions" of what occurred at the party even though she was not at the party. This prejudicial report was provided to the Sanctioning Panel for consideration in determining the sanction against John Doe.

76.     There was simply no corroborating evidence that would justify Stanton's finding of responsibility against John Doe. Stanton's finding that Jane Doe's account was more credible was clearly grounded in the biased assumption that Jane Doe was a victim whose account should be taken at face value. Stanton improperly presumed John Doe's guilt from the start of the investigation, shifting the burden of proof to John Doe to establish the falsity of Jane Doe's allegations, and mischaracterizing testimony to elicit evidence that "corroborated" Jane Doe's account.

**B.** **The Sanctioning Panel's Issuance of a Severe and Disproportionate Sanction**

77.     After Stanton found John Doe responsible for Sexual Exploitation under UVM's Policy, the investigation report was forwarded to Defendant Lee, an Assistant Director in UVM's Office for Student Conduct, who was responsible for selecting the Sanctioning Panel and presiding over the sanction hearing concerning John Doe.

78.     UVM has separate "Sanctioning Procedures" for students accused of sexual misconduct, in comparison to those accused of other types of misconduct. In accordance with these procedures, a sanction hearing is held immediately after a student is found responsible for violating UVM's Policy. There is no immediate right to appeal the outcome of the investigation or finding. This means that a student found responsible, who denied engaging in the alleged misconduct, has to appear before a panel that presumes him to be guilty of the same. This student is then forced to present the panel with information that would mitigate the sanction to be issued, even though he believes he has done nothing wrong.

79.     Per UVM's Sanctioning Procedures, "the sole purpose of the Sanctioning Panel is to determine the appropriate sanction(s) for violations of the [Policy] as well as other violations arising out of the same incident, found by a preponderance of the evidence as detailed in the Report of Investigation." "In all cases, the sanctions issued will be commensurate with the nature and severity of the violation(s) found to have occurred by the preponderance of the evidence." Thus, even if a Sanctioning Panel member disagreed with the investigation report, he or she would be forced to issue a sanction against the respondent.

80.     UVM's Policy refers to its "specially trained Sexual Harassment & Misconduct Sanctioning Panel." Per the Sanctioning Procedures, panel members attend only one annual training and, therefore, are not adequately trained to preside over sexual misconduct cases. Upon information and belief, the training presented to the panel members is biased against males.

22

81. The Sanctioning Panel in John Doe's case was comprised of Defendants Howard, McClements and Lee. These panel members violated UVM's Sanctioning Procedures by asking John Doe questions about the alleged incident with Jane Doe. Not only did this violate the Procedures, but it also evidenced their lack of training. Moreover, this improper conduct forced John Doe to defend himself in a proceeding in which he was told he could not contest Stanton's finding of responsibility or prior investigation.

82. The Sanctioning Panel called John Doe's character into question during the hearing, when Lee stated "good people make poor choices.". Yet UVM's Sanctioning Procedures prohibit respondents from submitting character statements to the panel for consideration.

83. Despite repeatedly noting that the hearing was not a proceeding meant to address the allegations, the Sanctioning Panel asked John Doe such inappropriate questions as what, if anything, would he do differently if he were in a similar situation, why was there an investigation if the incident never happened, and  what impact he thought his misconduct had on Jane Doe— even though he denied any wrongdoing, and denied ever meeting her on the night in question or knowing who she was. The hearing, in effect, forced John Doe to plead guilty to committing misconduct which he consistently denied having committed.

84. After the hearing, Lee notified John Doe that the panel had determined that a one semester suspension was warranted as a result of the finding. The notification letter, which was also sent to Jane Doe violated the Family Educational Rights and Privacy Act ("FERPA") as it disclosed a prior, yet minor, disciplinary matter that was part of John Doe's education records. This disciplinary matter occurred a year earlier, did not involve sexual misconduct and was wholly unrelated to Jane Doe's complaint.

85. As noted in the April 2011 Dear Colleague Letter, "FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's 'education

23

record.'" However, as stated in DOE Guidance, FERPA permits a university to disclose information to a complainant about a respondent's education record that relates directly to the complainant, such as the issuance of a sanction that directly relates to the complainant. John Doe's minor, unrelated violation, which the Sanction Panel improperly relied on as an aggravating factor in suspending John Doe, should have been redacted in the copy of the letter sent to Jane Doe. Jane Doe used this information, which was disclosed in violation of John Doe's privacy rights, in her response to John Doe's appeal.

86.     On July 14, 2017, the Sanctioning Panel issued a decision letter which was signed by Lee. The letter informed John Doe that he was suspended from UVM for the Fall 2017 semester. This sanction was extreme, unwarranted and disproportionate to the alleged conduct. The sanction letter evidences the severity of the sanction and the biased position of the panel members, who gave undue weight to portions of Jane Doe's impact statement—that the alleged conduct "happens all over the country at all times but often goes unaddressed", that the alleged incident impacted all women on campus who have been touched without consent, that "rape is not the only type of sexual harassment that exists on college campuses" and "in general, there is a lack of understanding about what constitutes consent"—in reaching their decision. Yet Jane Doe defined the alleged misconduct as merely disrespectful. The severity of the sanction imposed on John Doe indicated that the Panel was trying to make an example of him in response to Jane Doe's criticism of UVM's Policy.

87.     In finding that there were no mitigating factors, the Panel ignored that John Doe informed the panel that—though he denied that he engaged in the alleged conduct—he understood the seriousness of the conduct alleged and had not, and did not, pose a threat to the UVM community. John Doe had not previously been accused of any form of sexual harassment or misconduct.

88.     The sanction letter also misinterpreted John Doe as stating that he "enjoyed" Jane Doe's impact statement. As attested to by his attorney advisor—an officer of the court who was present at the hearing before the Sanctioning Panel—John Doe did not make this statement at the hearing.

### C.  The Lack of Meaningful Appeal

89.     Appeals in sexual misconduct cases at UVM are decided by a single individual; Defendant Mercurio was the Student Conduct Appeals Officer in John Doe's case. Upon information and belief, Mercurio served as a Deputy General Counsel at the time he decided John Doe's appeal and, therefore, had a clear conflict of interest.

90.     Appeals in sexual misconduct cases are limited to: i) procedural errors which materially affected the outcome of the case; ii) material evidence that has been discovered that was not reasonably available at the time of the investigation or sanctioning determination; or iii) a clear abuse of discretion on the part of the investigator or sanctioning panel. UVM's Sanctioning Procedures state that "parties have a right to appeal the investigation outcome." John Doe appealed his case on all three grounds.

91.     Mercurio denied John Doe's appeal by letter dated August 18, 2017. The tenor of the letter was unnecessarily hostile and did not comport with UVM's promise to treat all parties involved in sexual misconduct cases with respect.

92.     Mercurio also misinterpreted John Doe's arguments in support of his appeal and mischaracterized the evidence. As with prior administrators, Mercurio reiterated that he could not substitute his judgment for Stanton's or the Sanctioning Panel. If that were the case, then no UVM student, including John Doe, could effectively appeal an outcome, or sanction, under UVM's Policy.

93.     Among other things, Mercurio found that Jane Doe's friends "testified" that John Doe grabbed Jane Doe while they were dancing. There was no such testimony. Mercurio also found that the fact that Jane Doe "was upset" demonstrated that John Doe violated UVM's Policy. He ignored the witness statements, including the statements of Jane Doe's own witnesses, that Jane Doe was generally upset about inappropriate comments and behavior that occurred at the party she attended, and that no one could definitively state that John Doe grabbed her buttocks or that this was the reason she was upset.

94.     Demonstrating clear bias against males, Mercurio further stated that there was an "absence of any indication that she [Jane Doe] would have fabricated her account." This implied that John Doe was not only assumed to be a sexual aggressor, but was assumed to have fabricated his account by all UVM administrators involved in his case, and was burdened with having to prove his innocence throughout the proceeding against him.

95.     Mercurio clearly ignored that Stanton found John Doe's account to be credible then proceeded to misapply the preponderance of the evidence standard—a procedural error which materially affected the outcome of the case and also constituted an abuse of discretion. This was glaringly apparent in Stanton's citation to case law rather than UVM's stated evidentiary standard. It is also evident in the sparsity of the investigation report. While Mercurio disregarded John Doe's appeal as seeking "a second chance to plead" his case, John Doe never had a meaningful opportunity to be heard under UVM's Policy and Procedures in the first instance.

96.     Mercurio minimized the severity of the impact of the sanction on John Doe by stating that the suspension would not appear on his academic transcript. However, per UVM's recordkeeping policy John Doe's education records, including those concerning the sanction, would be readily available to parties making FERPA requests prior to John Doe's graduation

from UVM (i.e. potential employers or graduate schools) or for four years of consecutive absence from UVM.

97.     UVM's conduct, including the sanction, was the direct and proximate cause of tremendous damages to John Doe, including the loss of a scholarship and highly competitive teaching assistant position (9 out of 100 students were chosen), an unwarranted violation fee and other economic losses, loss of educational opportunities, emotional distress and other consequential damages.

### COUNT I
### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)
### (Against All Defendants)

98.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

99.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, Defendants are state actors subject to the Fourteenth Amendment.

100.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

101.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

102.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

103. John Doe's constitutionally protected property interest in his continued enrollment at UVM and to be free from arbitrary suspension arises from the policies, courses of conduct, practices and understandings established by UVM.

104. John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between UVM and John Doe.

105. It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

106. A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

107. As a result, if John Doe as a UVM student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that UVM used.

108. UVM, as a public, land grant university established by the State of Vermont, and the individual Defendants, as agents of UVM, have a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by UVM.

109. John Doe had obeyed all institutional rules when he was wrongly suspended from UVM.

110. Under both federal and state law, John Doe had a constitutionally protected property interest in continuing his education at UVM.

28

111.   John Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for John Doe.

112.   John Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

113.   In the course of such investigation and adjudication, Defendants flagrantly violated John Doe's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by employing a Kafkaesque process in which there is no cross-examination, no sworn testimony, a sanction hearing is held after a single investigator has already determined responsibility, a respondent has no adequate ability to defend himself, there is no presumption of innocence but rather a presumption that the female's accusations are true, there is no reasoned consideration of evidence as required by a burden of proof, no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in discriminatory decision-making.

114.   Cross-examination has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997). Yet, in a case where UVM relied upon a credibility assessment determined by a single investigator, there was no hearing, no sworn testimony was taken and thus no cross-examination was available, in violation of due process of law. *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

115.   Defendant Stanton, UVM's Title IX Coordinator, discharged responsibilities in UVM's Title IX adjudications that involved a conflict of interest contrary to a Fourteenth Amendment interest in a fair process. Stanton was singlehandedly responsible for:

(a)   Notifying John Doe of the allegations;

29

(b)      Determining the potential policy violations raised by the alleged misconduct;

(c)      Issuing a no contact order to both parties;

(d)      Gathering any relevant evidence;

(e)      Deciding, in his sole discretion, which witnesses should be interviewed and which evidence should be considered;

(f)      Applying the preponderance of the evidence standard to the evidence he deemed relevant;

(g)      Determining whether John Doe was responsible; and

(h)      Issuing a written investigation report that was turned over to a Sanctioning Panel. The Sanctioning Panel could only determine punishment, and could not reassess any aspect of the investigation.

116.    Stanton's responsibilities were overbroad and held a conflict of interest as determined by Title IX guidance: "Title IX coordinators should not have other responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest." By putting decision-making as to violation and sanction in one person who is the Title IX Coordinator, it permits, among other things, decision-making in specific cases to be tailored to give the appearance of vigorous Title IX enforcement and meet perceived reporting needs to the OCR.

117.    Defendants were pressured by the Obama Administration's DOE into following the Title IX investigative and adjudicatory process mandated by the April 2011 Dear Colleague Letter regardless of what otherwise would be due process considerations. In 2014, UVM entered into a settlement with OCR in order to avoid a Title IX violation. In August 2017 UVM became

the subject of another OCR investigation. As a result, UVM "affirmed its commitment to victims of sexual assault."

118.    As recently acknowledged by current Secretary of Education DeVos, the April 2011 Dear Colleague Letter has negatively impacted the due process rights of those accused of sexual misconduct. Significantly, DeVos proclaimed that the "era of 'rule by the letter' is over." The April 2011 Dear Colleague Letter has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined." Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated.

119.    On September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and related guidance, affirming that it placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the     accused,      and are in no way required by Title IX law or regulation.'" *See* https://www2. ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

120.    Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be innocent until shown to be responsible and not to be subjected to the burden of proving innocence, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

121.    The Defendants subjected John Doe to an insufficient process when they failed to provide John Doe with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by gender bias.

122.    As a result, Defendants failed to provide John Doe with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

123.    Defendants, as well as other agents, representatives, and employees of UVM were acting under color of state law when they showed intentional, outrageous, and reckless disregard for John Doe's constitutional rights.

124.    Defendants all agreed to, approved, and ratified this unconstitutional conduct.

125.    As a result of these due process violations, John Doe continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, suspension from UVM denied him the benefits of education at his chosen school, including a coveted teaching assistant position during the Fall semester and also damaged John Doe's academic and professional reputation.

126.    Accordingly, Defendants are liable to John Doe in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

127.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries and other direct and consequential damages. John Doe's interests in the results of the disciplinary process are significant.

128.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and

disbursements and to an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints at UVM.

## COUNT II
### (Violation of Title IX of the Education Amendments of 1972-Erroneous Outcome)
### (Against UVM)

129.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

130.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

131.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

132.   According to a published audited financial statement for fiscal year 2016, UVM was the recipient of $115,455,000 in federal appropriations, grants and contracts. Per the audited financial statement "[t]he University receives significant funding from federal and state agencies in the form of grants and contracts."

133.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

134.   The Obama Administration's DOE has promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and

equitable resolution of student... complaints alleging any action which would be prohibited by"
Title IX or regulations thereunder. Such prohibited actions include all forms of sexual
misconduct. 34 C.F.R. § 106.8(b).

135.   Even the Obama Administration's DOE has ostensibly recognized that the
procedures adopted by a school such as UVM and covered by Title IX must accord due process
to all parties involved. The practical reason why due process matters is so that cases are not
decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall
v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

136.   The Obama Administration's DOE has also ostensibly recognized that there must
be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an
obligation under Title IX to make sure that all employees involved in the conduct of the
procedures have "adequate training as to what conduct constitutes sexual harassment, which
includes "alleged sexual assaults." Upon information and belief, neither UVM's Title IX
Coordinator nor the Sanctioning Panel members receive adequate training. Investigations
conducted at UVM, including in John Doe's case, are not adequate, reliable or impartial.

137.   The OCR's September 2017 Guidance requires that: (i) a person free from actual
or perceived conflicts of interest or biases must lead sexual misconduct investigations; (ii)
training materials or investigative techniques that "apply sex stereotypes or generalizations may
violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights
and opportunities made available to complainants must be made available to respondents; (iv)
"[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may
violate Title IX and should be avoided" to ensure objective and impartial investigation; and (v)
those issuing sanctions must consider the impact of separating a student from his or her

education      and      be      proportionate      to      the      violation.      *See*

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

138.    Current DOE Secretary DeVos stressed that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated. UVM's Policy and Procedures are biased towards finding male students responsible and provide inadequate due process protections for students accused of sexual misconduct.

139.    Challenges to university disciplinary proceedings for sex discrimination fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

140.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault and gender bias was a motivating factor.

141.    The denial of due process in this case resulted in an "erroneous outcome" based on an erroneous and distorted conception of the facts.

142.    UVM failed to conduct an adequate, reliable, and impartial investigation when it investigated and adjudicated Jane Doe's allegations in a manner that was biased against John Doe and evidenced bias against male students at UVM. Throughout the investigation, and through the appeal, UVM's administrators presumed that Jane Doe had no motive to fabricate the allegations, improperly placing the burden on John Doe to prove his innocence. The fact of a complaint was essentially weighed as evidence that a violation occurred. Stanton corrupted the

investigation process with bias by searching Facebook for a potential suspect, pinpointing John Doe and asking Jane Doe and a friend to "confirm" him as the respondent. At all steps of the process Jane Doe's allegations assumed true, while exculpatory evidence was ignored.

143.    UVM has created a victim-centered process in which a complaint against a male student is prosecuted under a presumption of guilt. This one-sided process deprived John Doe, as a male student, of educational opportunities at UVM on the basis of his sex. It is also a clear violation of the preponderance of the evidence standard.

144.    UVM held no hearing of any kind to determine the facts or assess credibility of witnesses, but rather relied upon its Title IX Director, Stanton, to singularly determine—based on a few abbreviated phone interviews over the summer break—whether John Doe violated UVM's Policy.

145.    As stated above, cross-examination has been held to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997). Yet, in a case where UVM relied upon a credibility assessment, no cross-examination was available and no sworn testimony was taken in violation of due process of law. *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

146.    Stanton, UVM's Title IX Coordinator discharged responsibilities in university Title IX adjudications that involved a conflict of interest contrary to Title IX guidance. As Title IX Coordinator, Stanton was responsible for appointing an investigator to John Doe's case. Stanton appointed himself as the sole investigator, responsible for collecting and weighing evidence, applying the preponderance of the evidence standard to the evidence that he collected and determining whether John Doe was responsible for any policy violations. Stanton's finding could not be questioned by the Sanctioning Panel and was used to determine John Doe's sanction.

147. Stanton's responsibilities were overbroad and held a conflict of interest as determined by Title IX guidance: "Title IX coordinators should not have other responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest." By putting decision-making as to violation in the Title IX Coordinator, it permits, among other things, decision-making in specific cases be tailored to give the appearance of vigorous Title IX enforcement and meet perceived reporting needs to the OCR.

148. Moreover, in John Doe's case, Stanton exhibited a bias against males accused of sexual misconduct, as he presumed John Doe was guilty from the beginning and built a case around that presumption despite a lack of supporting evidence. In contrast, Jane Doe was perceived by Stanton as truthful and her story was taken at face value, as Stanton even helped her to identify the alleged perpetrator of the offensive conduct.

149. The totality of the circumstances establish that Defendants acted out of gender bias in reaching the "erroneous outcome." UVM credited false accusations of sexual exploitation made by a female who could not initially identify John Doe, presumed from the start of the investigation that, because John Doe was male (and therefore the aggressor), that he was guilty, and forced John Doe to prove his innocence rather than properly applying the preponderance of the evidence standard. Stanton, who held biased presumptions against males accused of sexual misconduct, ignored John Doe's credible denial and sought out "corroborating evidence" in order to validate Jane Doe's story.

150. Subsequently, the sanctioning panel forced John Doe to speak to the alleged misconduct—which they presumed had occurred despite his credible denial—and made an example of John Doe in the face of Jane Doe's criticism of UVM's Policy.

151.    The appeal officer on John Doe's case, who had a clear conflict of interest, demonstrated bias against males in his decision letter and exhibited hostility against John Doe when denying his appeal. These proceedings took place only weeks before OCR opened an investigation at UVM, and the university affirmed its commitment to victims of sexual misconduct.

152.    UVM required no reasoned consideration of evidence as required by a burden of proof. Stanton's investigation report and finding reflected a failure to apply the preponderance of the evidence standard and actually revealed the absence of a preponderance of the evidence supporting the finding of a Policy violation by John Doe. Stanton's finding that Jane Doe was more credible than John Doe was unsupported by the sparse evidence Stanton managed to collect which actually contradicted Jane Doe's account of what happened. Given that there was no hearing that included the questioning of witnesses, there was no proper basis for making such credibility judgments. Only an anti-male bias to find for the female complainant and against the male respondent can explain Stanton's purported findings concerning the preponderance of the evidence.

153.    The Sanctioning Panel's issuance of a one-semester suspension, which was unduly severe in light of the allegations, was affected by John Doe's male gender. Jane Doe's false allegations against John Doe were viewed in light of Jane Doe's written impact statement, in which she criticized UVM for failing to educate male students about consent and noted how the alleged misconduct impacts all women on college campuses who have been "touched without consent." The Sanctioning Panel's serious consideration of this statement in deciding to suspend John Doe indicates that their decision was motivated by bias against male students, whom they viewed as uneducated, sexual aggressors who victimized female students by failing to obtain

consent. Jane Doe's statement was not relevant to the facts of her case and should have been disregarded by the Sanctioning Panel.

154.    The totality of circumstances establishes that UVM has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

155.    Upon information and belief, all students that have been suspended or expelled from UVM for sexual misconduct have been male.

156.    Male respondents in sexual misconduct cases at UVM are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

157.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

158.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT III
## (Breach of Contract)
### (Against UVM)

159.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

160.    Based on the aforementioned facts and circumstances, UVM created express and implied contracts when it offered, and Plaintiff accepted, admission to UVM and paid the required tuition and fees.

161.   UVM committed several breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Doe's allegations against him, including but not limited to:

   a. failing to conduct a thorough, fair impartial and equitable investigation. Policy, at p. 12; Procedures § I.

   b. failing to fairly and impartially adjudicate the allegations against John Doe.

   c. Failing to provide John Doe with "appropriate procedural rights in accordance with the law and applicable University Policy." Procedures, § IV, "Step 3"

   d. failing to apply the preponderance of the evidence standard as defined in UVM's Policy. Policy, at p. 5.

   e. upon information and belief, failing to adequately train Sanctioning Panel members. Policy, at p. 12; Sanctioning Procedures, § III.B.

   f. questioning John Doe about the investigation and allegations against him during the hearing before the Sanctioning Panel. Sanctioning Procedures, III.C.

   g. failing to issue a sanction commensurate with the nature and severity of the purported violation. Sanctioning Procedures, § III.A.

162.   As a result of the direct and foreseeable consequence of the foregoing breaches Plaintiff sustained tremendous damages including emotional distress, loss of education and career opportunities, economic injuries and other direct and consequential damages.

163.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
## (Breach of the Covenant of Good Faith and Fair Dealing)
## (Against UVM)

164.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

165.    Based on the aforementioned facts and circumstances, UVM acted in bad faith when it meted out, and upheld, a disproportionate sanction of suspension against John Doe notwithstanding a flawed and biased investigation and sanction hearing.

166.    Based on the aforementioned facts and circumstances, UVM breached the covenant of good faith and fair dealing implied in its agreement(s) with Plaintiff.

167.    As a direct and foreseeable consequence of this breach, Plaintiff sustained tremendous damages including emotional distress, loss of education and career opportunities, economic injuries and other direct and consequential damages.

168.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT V
### (Estoppel and Reliance)
### (Against UVM)

169.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

170.    UVM's various policies constitute representations and promises that UVM should have reasonably expected to induce action or forbearance by Plaintiff.

171.    UVM expected or should have expected Plaintiff to accept its offer of admission, incur tuition and other expenses, and choose not to attend other universities based on its express and implied promises that UVM would not tolerate, and Plaintiff would not suffer, discrimination and would not be denied his procedural rights should he be accused of a violation of UVM's policies.

172.    Plaintiff relied to his detriment on these express and implied promises and representations made by UVM, by choosing to attend UVM rather than another school of equal caliber and paying the required tuition and fees.

41

173.    UVM's express and implied promises must be enforced to prevent substantial injustice to Plaintiff.

174.    Based on the foregoing UVM is liable to Plaintiff based on promissory estoppel.

175.    As a direct and proximate result of the foregoing conduct, Plaintiff sustained tremendous damages including loss of education and career opportunities, economic injuries and other direct and consequential damages.

176.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VI
### (Gross Negligence)
### (Against All Defendants)

177.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

178.    Defendants owed duties of care to Plaintiff that arose from UVM's Policy and Procedures, the Fourteenth Amendment of the United States Constitution, and directives issued by the OCR in the form of the April 2011 Dear Colleague Letter and related guidance. Such duties included implementing and executing policies and procedures concerning sexual misconduct complaints that afforded students accused of sexual misconduct adequate due process protections, and investigating and adjudicating allegations of sexual misconduct in a manner that was impartial and fair to both the complainant and respondent,

179.    UVM, its Board of Trustees and Sullivan breached these duties by adopting policies and procedures that obliterate the due process protections of students accused of sexual misconduct, including John Doe. Their adoption of a single investigator model demonstrates a palpable disregard and complete indifference to the rights of respondents to be heard, to be able

42

2 of 46  Document 1  Filed 11/16/17  Page 43 of 46

to adequately defend themselves and to have a meaningful appeal within a process that is free from bias and discrimination.

180.     Stanton, as Title IX director, acted indifferently to the duties he owed to John Doe when he: appointed himself as investigator despite a clear conflict of interest; showed Jane Doe and her friend John Doe's Facebook profile in order to elicit an identification without showing them other profiles or photos; carelessly investigated the allegations against John Doe by speaking to him—and all of the witnesses—briefly by phone; failed to include exculpatory information obtained from witnesses in his investigation report; applied Second Circuit case law to the evidence collected rather than utilizing the preponderance of the evidence standard as defined in UVM's Policy; determined that there was corroborating evidence for Jane Doe's account when there was none because he presumed she was a victim who was telling the truth and misconstrued the preponderance of the evidence standard as a measure of credibility.

181.     Defendants Howard, Lee and McClements, who sat on the Sanctioning Panel, breached the duties owed to John Doe when they heedlessly violated his rights by questioning him about the prior investigation during the sanction hearing, taking into account Jane Doe's commentary about women who have been touched without consent on college campuses across the country and issuing a suspension that was not commensurate with the conduct alleged by Jane Doe. Lee further breached duties owed to John Doe when she sent a copy of the Sanctioning Panel letter to Jane Doe that referenced an unrelated disciplinary matter concerning John Doe.

182.     Mecurio breached his duties to John Doe, and acted indifferently to his rights, when he sent a hostile letter to John Doe that upheld the sanction on the ground that he believed that Jane Doe had no reason to fabricate the allegations against John Doe, thus presuming that John Doe had fabricated his account. Mercurio also misinterpreted the evidence and

mischaracterized John Doe's arguments on appeal. Upon information and belief, Mercurio was Deputy General Counsel at the time he issued the letter, creating a conflict of interest.

183.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages including, without limitation, emotional distress, loss of educational and career opportunities and other direct and consequential damages.

184.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)   on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints;

(ii)   on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against UVM awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

(iii)   on the third cause of action for state law breach of contract, a judgment against UVM awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment against UVM awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)      on the fifth cause of action for state law estoppel and reliance, a judgment against UVM awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for state law gross negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by UVM should be reversed; (ii) Plaintiff's reputation should be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; and (vi) UVM's Policy and Procedures are unconstitutional as applied;

(viii)   an injunction directing UVM to: (i) reverse the outcome and findings regarding Jane Doe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; and (iv) permanently destroy any record of Jane Doe's complaint; and

(ix)     awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated this 15th day of November, 2017.

Respectfully Submitted,


COLE ASSOCIATES CIVIL LAW, PLLC


Carolyn K. Cole, Esq.
18 Bank Street
Lebanon, New Hampshire 03766
(603)678-8070
ccole@coleassociateslaw.com

NESENOFF & MILTENBERG, LLP


Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
Kara L. Gorycki
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
kgorycki@nmllplaw.com

(*PRO HAC VICE* ADMISSION PENDING)

**Attorneys for Plaintiff John Doe**